## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL V. VRABEL, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION NO. 3:2006-73 |
| | ) |
| v. | ) |
| | ) |
| GREATER JOHNSTOWN WATER | ) |
| AUTHORITY and | ) |
| RDM-JOHNSTOWN, LLC, | ) JUDGE GIBSON |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on Motions for Summary Judgment filed by Defendant

RDM-Johnstown, LLC. ("RDM"), and Defendant Greater Johnstown Water Authority ("Water

Authority").[1] Document Nos. 48 & 52. For the reasons that follow, these Motions for Summary

Judgment will be granted.

### II. BACKGROUND

Between 1964 and February 17, 2005, Laurel Management Company ("Laurel") was a party to

an agreement with the Water Authority whereby Laurel would manage and maintain the water system

in the Greater Johnstown area. Document Nos. 49, 54, 59 & 63, ¶ 1. This contract was typically

---

[1]The Court infers from the record that the letters "RDM" stand for Resource Development & Management, Inc.
Document No. 51, p. 5.

1

renewed every few years. Document Nos. 54 & 59, ¶ 2. Although a collective bargaining agreement was in effect between Laurel and its employees, the Water Authority was not a party to it. *Id.*, ¶ 3.

Plaintiff Paul V. Vrabel ("Vrabel") commenced his employment with Laurel on September 13, 1976. *Id.*, ¶ 7. He was hired by Bill Cvrkel ("Cvrkel"), who was Laurel's General Manager. *Id.*, ¶ 8. At that time, Laurel's contract with the Water Authority was already in place. Vrabel was hired by Laurel rather than by the Water Authority. *Id.*

Vrabel spent the overwhelming majority of his time at Laurel working pursuant to the contract with the Water Authority, although he occasionally worked pursuant to other contracts to which Laurel was a party. *Id.*, ¶ 9. He spent his first eight years as a Laurel employee working as a construction maintenance man. *Id.*, ¶ 10. During the following eight to nine years, he worked as a utility man. *Id.* He was a "meter man A" for the last fifteen years of his career at Laurel. *Id.* As such, he was responsible for reading meters. *Id.* Michael Kukura ("Kukura"), a Laurel employee, acted as Vrabel's supervisor. *Id.*, ¶ 11. When he was the subject of a customer complaint, Vrabel would report to either Kukura or Mitchell Azar ("Azar"), Laurel's President. *Id.*

During the last few years of his employment with Laurel, Vrabel drove a small pickup truck provided by Laurel while performing his duties. *Id.*, ¶ 12. The truck had the words "Laurel Management" written on its side. *Id.* While on duty, Vrabel wore a uniform. *Id.*, ¶ 13. The uniform included a patch displaying the words "Laurel Management" and "Greater Johnstown Water Authority." *Id.* On a given workday, Vrabel would drive to Laurel's office in his own vehicle and then use Laurel's vehicle for work-related trips (i.e., trips to read meters). *Id.*, ¶ 14. Laurel determined Vrabel's schedule. *Id.* Vrabel's paychecks were issued by Laurel. *Id.*, ¶ 16. His hourly wage was determined in

2

accordance with the collective bargaining agreement. *Id.*, ¶ 17. Laurel provided Vrabel with the tools necessary for him to do his job, such as a curb wrench, a street wrench and a device for the reading of meters. *Id.*, ¶ 18. Vrabel's personnel file was maintained by Laurel, and he would contact Laurel whenever he needed to miss a day of work. *Id.*, ¶¶ 19-20. He was provided with Laurel's company policies and work rules. *Id.*, ¶ 21. Vrabel attended safety training sessions at Laurel's offices, which were run by Laurel personnel. *Id.*, ¶ 22.

Sometime near the beginning of this decade, the Water Authority decided to solicit new bids for the management and maintenance of its water system. *Id.*, ¶ 4. Members of the Water Authority's board of directors apparently believed that they could get a better contract than the one which had been in place with Laurel. *Id.* Laurel, RDM and American Waterworks each submitted bids for the new contract with the Water Authority. *Id.*, ¶ 5. The contract was awarded to RDM in 2003 because RDM had submitted the lowest bid. *Id.*, ¶ 6. The Water Authority and RDM entered into a management services contract on February 27, 2003, which anticipated that RDM would begin to provide services on February 18, 2005. Document Nos. 49 & 63, ¶ 2. This contract required RDM to hire qualified employees who had experience working on the Greater Johnstown water system. *Id.*, ¶ 3. In accordance with this obligation, RDM began to solicit applications from Laurel's employees. *Id.*, ¶ 4. During the middle part of 2003, RDM hired Kukura, David DiNicola ("DiNicola"), Jeffrey Smith ("Smith") and Ronald Felix ("Felix") as managers. *Id.*, ¶ 6. Shortly thereafter, RDM began the process of filling vacancies for service and labor employees. *Id.*, ¶ 7. Christopher Kerr ("Kerr"), RDM's Vice-President of Operations, was responsible for making these hiring decisions. *Id.* The managers apparently had some input as to whether a particular individual was hired. *Id.*

3

Vrabel applied for a position with RDM on November 19, 2003. *Id.*, ¶ 8. Later that month, Vrabel was interviewed by Kerr. Document Nos. 54 & 59, ¶ 27. Kerr interviewed Vrabel again on August 12, 2004. *Id.*, ¶ 28. No Water Authority personnel were present during these interviews. *Id.*, ¶ 30. At the time of his second interview, Vrabel was forty-eight years old. *Id.*, ¶ 29. On that occasion, Kerr informed Vrabel that he would not be offered a position with RDM. *Id.*, ¶ 28. The Water Authority played no role in the decision to terminate Vrabel's employment with Laurel, and Vrabel was never told that the Water Authority had played a role in RDM's decision not to hire him. *Id.*, ¶¶ 33-35.

Vrabel's employment with Laurel apparently ended on February 17, 2005, as a consequence of Laurel's loss of its contract with the Water Authority. Document No. 11-3, pp. 2-3. Vrabel has no evidence that the Water Authority played a role in RDM's decision not to hire him, or in Laurel's decision to terminate him. Document Nos. 54 & 59, ¶¶ 33-35. There were four other applicants from Laurel who were not hired by RDM. Document Nos. 49 & 63, ¶ 10.

On June 13, 2005, Vrabel filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that RDM had violated the Age Discrimination in Employment Act ("ADEA") [29 U.S.C. § 621 *et seq.*] by failing to hire him on account of his age. Document No. 8-2, pp. 1-4. Vrabel commenced this action against Laurel, the Water Authority and RDM on March 29, 2006. Document No. 1. Given that more than sixty days had passed since the filing of his EEOC charge, Vrabel was entitled to file a suit pursuant to 29 U.S.C. § 626(c). 29 U.S.C. § 626(d). The parties stipulated to the dismissal of Laurel as a party on February 7, 2007, and the Court signed an order adopting the stipulation thirteen days later. Document Nos. 25 & 26. Consequently, Laurel was removed as a party in this case.

4

RDM filed a Motion for Summary Judgment on July 13, 2007, arguing that its decision not to

hire Vrabel had not constituted a violation of the ADEA. Document Nos. 46 & 48. Three days later,

the Water Authority filed a Motion for Summary Judgment, contending that it was not Vrabel's

"employer" within the meaning of the ADEA. Document Nos. 50 & 51. These motions are currently

pending before the Court and, hence, are the subject of this memorandum opinion.

## III. SUMMARY JUDGMENT STANDARDS

> Summary judgment is appropriate only when it is demonstrated that there is no genuine
> issue as to any material fact and the moving party is entitled to judgment as a matter of
> law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91
> L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine
> 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving
> party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91
> L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all
> reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And
> Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law
> will properly preclude the entry of summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted. *See generally* 10A C. Wright, A. Miller,
> & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality
> inquiry is independent of and separate from the question of the incorporation of the
> evidentiary standard into the summary judgment determination. That is, while the
> materiality determination rests on the substantive law, it is the substantive law's
> identification of which facts are critical and which facts are irrelevant that governs. Any
> proof or evidentiary requirements imposed by the substantive law are not germane to
> this inquiry, since materiality is only a criterion for categorizing factual disputes in their
> relation to the legal elements of the claim and not a criterion for evaluating the
> evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

5

## IV. JURISDICTION AND VENUE

The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 216(b) and 626(b)-(c). Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

Before proceeding to the factual circumstances related to Vrabel's claims, the Court must take note of a few preliminary points. The ADEA defines an "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current of preceding calendar year[,]" including "a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State[.]" 29 U.S.C. § 630(b). The relevant language in the ADEA provides:

> **§ 623. Prohibition of age discrimination**
>
> **(a) Employer practices.** It shall be unlawful for an employer--
>
> > (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
> > (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
> > (3) to reduce the wage rate of any employee in order to comply with this Act.

29 U.S.C. § 623(a)(1)-(3). The plain language of the ADEA makes it clear that the prohibitions contained therein are "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

Since this is a federal employment discrimination case in which no direct evidence of discrimination is presented, the United States Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community*

6

*Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the pending motions for summary judgment.[2] Generally speaking, a plaintiff who has no direct evidence of discrimination must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802-803, 93 S.Ct. 1817, 1824-1825, 36 L.Ed.2d 668, 677-678. If a *prima facie* case is established, the defendant must then articulate a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *Id.* If the defendant articulates a legitimate, nondiscriminatory reason for the adverse treatment, the plaintiff can defeat a motion for summary judgment by pointing to some evidence from which a rational finder of fact could reasonably either disbelieve the employer's articulated explanation or "believe that an invidious discriminatory reason was more likely than not a [] determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff "may succeed in this either directly by persuading the court [for purposes of summary judgment] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217.

The *McDonnell Douglas/Burdine* framework does not apply in cases in which direct evidence of discrimination is presented. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 997, 152 L.Ed.2d 1, 9 (2002). Direct evidence of discrimination is evidence that is "so revealing of

[2]The Supreme Court has not held that the *McDonnell Douglas/Burdine* framework is applicable to ADEA cases. Instead, it has assumed *arguendo* that the *McDonnell Douglas/Burdine* framework applies in this context. *Smith v. City of Jackson*, 544 U.S. 228, 252, 125 S.Ct. 1536, 1551, 161 L.Ed.2d 410, 429 (2005)(O'Connor, J., concurring in the judgment); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 1309-1310, 134 L.Ed.2d 433, 438 (1996). The United States Court of Appeals for the Third Circuit, however, has held that the *McDonnell Douglas/Burdine* burden-shifting framework applies in ADEA cases that do not involve direct evidence of age discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)(*en banc*).

7

discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). In such cases, there is no need for an *inference* of discrimination, since the discrimination is readily apparent. Where the *McDonnell Douglas/Burdine* framework does apply, "the precise elements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. at 997, 152 L.Ed.2d at 9, quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978). In *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained that "the elements of a *prima facie* case depend on the facts of the particular case[,]" and that "a *prima facie* case cannot be established on a one-size-fits-all basis." Thus, "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003).

In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the Supreme Court held that the statutory language limiting the ADEA's protections to those who have attained the age of forty is relevant for no purpose other than determining whether a plaintiff is within the class of persons entitled to statutory protection. *O'Connor*, 517 U.S. at 313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 439 ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."). The Supreme Court explained the relationship between the substantive provisions of the ADEA and 29 U.S.C. § 631(a)'s delineation of the protected class as those

8

who have reached the age of forty:

> The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*. Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

*O'Connor*, 517 U.S. at 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 438 (emphasis in original).

Notwithstanding the ADEA's prohibition of discrimination *based on age*, however, the prohibitions contained therein only apply in one direction (i.e., prohibiting discrimination which favors the young and disfavors the old, but *not* prohibiting discrimination which favors the old and disfavors the young). In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004), the Supreme Court held that the ADEA does not prohibit discrimination against younger individuals. The Supreme Court explained that, within the context of 29 U.S.C. § 623(a)(1), the words "because of such individual's age" essentially mean "because of such individual's [old or advanced] age." *General Dynamics*, 540 U.S. at 594-600, 124 S.Ct. 1236, 1245-1249, 157 L.Ed.2d 1094, 1109-1113. Assuming that the plaintiff in a given case is within the class of persons protected under the ADEA (*i.e.*, someone who has attained the age of forty) and is alleging that the defendant took an adverse employment action against him or her because of his or her advanced age, the dispositive question is whether the plaintiff's age "actually motivated" the defendant's adverse employment

9

decision. *Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 512 (3d Cir. 2004). In this context, age can be said to have "actually motivated" the defendant's decision if it played a role in the decisionmaking process and "had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000).

## A. The Water Authority's Motion for Summary Judgment

In support of their Motions for Summary Judgment, the Defendants both argue that the decision not to hire Vrabel was made for reasons other than his age. In addition, the Water Authority argues that it was neither Vrabel's employer nor his prospective employer, but rather an entity under contract with his employer (Laurel) and, later, with his prospective employer (RDM). Document No. 53, pp. 5-12. The Water Authority argues that it was never Vrabel's "employer" (or prospective "employer") within the meaning of the ADEA.

The ADEA defines the term "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[,]" including "a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State[.]" 29 U.S.C. § 630(b). In this context, the word "person" means "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized groups of persons." 29 U.S.C. § 630(a). The parties do not appear to dispute that the Water Authority is a "person." Nonetheless, they clearly disagree as to whether it is an "employer."

As a general matter, "the precise contours of an employment relationship can only be established by a careful factual inquiry." *Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997). In *National Labor*

10

*Relations Board v. Browning-Ferris Industries of Pennsylvania*, 691 F.2d 1117 (3d Cir. 1982), the Court of Appeals for the Third Circuit made a distinction between a "single employer" relationship and a "joint employer" relationship. "A 'single employer' relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" *Browning-Ferris*, 691 F.2d at 1122. In such a situation, the relevant question is "whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise*." *Id.* (emphasis in original).

In contrast, a finding that two entities are "joint employers" assumes that they are what they appear to be (*i.e.*, separate entities). *Id.* A finding that two entities are joint employers "recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.* at 1123 (emphasis in original). The basis for such a finding is that one employer, while contracting in good faith with a distinct entity, "has retained for itself sufficient control of the terms and conditions of employment" of the individuals who are employed by that entity. *Id.* In this case, no party asserts that the Water Authority is essentially the same entity as RDM (or that it was the same entity as Laurel). Consequently, the dispositive question is whether the Water Authority and RDM can be fairly characterized as "joint employers" for purposes of this case.

There are different tests employed by courts for determining whether an individual is an employee of a given entity. One such test is derived from the following passage in the Supreme Court's decision in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989):

11

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

*Reid*, 490 U.S. at 751-752, 109 S.Ct. 2166, 2178-2179, 104 L.Ed.2d 811, 831-832 (internal citation and footnotes omitted). In *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 211, 117 S.Ct. 660, 666, 136 L.Ed.2d 644, 654 (1997), the Supreme Court indicated that this thirteen-factor inquiry provided the applicable framework for determining whether an entity employed a sufficient number of employees to constitute an "employer" within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*].[3]

Last year, in *Butterbaugh v. Chertoff*, 479 F.Supp.2d 485, 492 (W.D.Pa. 2007), this Court noted that the "central question" of whether an entity is a "joint employer" under *Browning-Ferris* is virtually identical to the question of whether such an entity constitutes an "employer" under the factors enumerated in *Reid*, even though different factors may guide the analysis. In determining whether an entity (such as the Water Authority in this case) constitutes a joint employer under *Browning-Ferris*, a court must consider the following factors: (1) "authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours;"

---

[3] Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . ." 42 U.S.C. § 2000e(b).

12

(2) "day-to-day supervision of employees, including employee discipline;" and (3) "control of employee records, including payroll, insurance, taxes and the like." *Butterbaugh*, 479 F.Supp.2d at 491. The Court of Appeals for the Third Circuit has not explained the circumstances in which the more generalized "joint employer" test should be used instead of the thirteen-factor *Reid* test. *Wilson v. MVM, Inc.*, 475 F.3d 166, 172-173 (3d Cir. 2007)(declining to address the question on the ground that its resolution was unnecessary in the case at issue).

In *Butterbaugh*, this Court opined that while the *Reid* test provides the applicable framework for determining whether an employer meets Title VII's employee-numerosity requirement, the *Browning-Ferris* analysis may be the appropriate framework for determining whether a particular individual is an "employee" of an entity that is concededly an "employer" within the meaning of Title VII. *Butterbaugh*, 479 F.Supp.2d at 492-494. In so observing, the Court noted that a defense based on Title VII's employee-numerosity requirement "indicates that a particular lawsuit threatens to expand Title VII beyond its congressional design" (i.e., by imposing obligations on, and extending liability to, entities not intended to be covered under the statute), whereas a defense based on a lack of an employment relationship between the defendant and the plaintiff may undermine Title VII's broad remedial purpose (i.e., by depriving individuals of statutory protection from discrimination perpetrated by entities clearly covered by Title VII). *Id.* at 492-493. Title VII, of course, defines the term "employee" simply as "an individual employed by an employer . . ." 42 U.S.C. § 2000e(f).

At the outset, the Court notes that the applicable definitions contained in the ADEA are not materially different from those contained in Title VII. The ADEA defines the term "employee" as "an

13

individual employed by any employer . . ." 29 U.S.C. § 630(f).[4] Although the employee-numerosity requirements of these two statutes differ, they differ only in the number of employees needed for an entity to constitute a covered "employer."[5] Therefore, the Court's analysis of the applicable Title VII provisions in *Butterbaugh* guides the analysis of the applicable ADEA provisions in this case. The application of this analysis in the instant case, however, is somewhat problematic because the Water Authority appears to base its argument on *both* the ADEA's employee-numerosity requirement *and* its "employment" relationship (or lack thereof) with Vrabel. The Court has before it an affidavit completed by Edward Cernic ("Cernic"), the Chairman of the Water Authority, stating that the Water Authority only employed three individuals during the period of time in question. Document No. 54-2, p. 38. The Court is convinced that the ADEA's employee-numerosity requirement, like that contained in Title VII, is properly characterized as "an element of a plaintiff's claim for relief," thereby requiring Vrabel to establish that the Water Authority is an "employer" within the meaning of the ADEA. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516, 126 S.Ct. 1235, 1245, 163 L.Ed.2d 1097, 1110-1111 (2006). In determining whether an individual counts as one of the twenty "employees" needed to satisfy the ADEA's employee-numerosity requirement, a court must apply the thirteen-factor test discussed in *Reid. Walters*, 519 U.S. at 211-212, 117 S.Ct. at 666, 136 L.Ed.2d at 654, citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-324, 117 L.Ed.2d 581, 112 S.Ct. 1344 (1992); *Butterbaugh*, 479

---

[4] The ADEA's definition of the term "employee," like Title VII's definition of that same term, includes exceptions to the general definition which are not relevant to the Court's analysis in this case. 29 U.S.C. § 630(f); 42 U.S.C. § 2000e(f).

[5] Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . ." 42 U.S.C. § 2000e(b). The ADEA's definition is similar, but it includes only entities which employ twenty (rather than fifteen) or more individuals. 29 U.S.C. § 630(b).

14

F.Supp.2d at 492 ("Thus, when the question is not whether the defendant employed the plaintiff, but whether the defendant employed a sufficient number of other people to meet the requirements of subsection (b), the more scrutinous thirteen-factor test governs."). Nevertheless, in this case, the Water Authority also argues that Vrabel was never an employee (or prospective employee) of the Water Authority (i.e., that Vrabel was never *employed by* the Water Authority for purposes of 29 U.S.C. § 630(f)). In *Butterbaugh*, the Court concluded that this latter inquiry was to be conducted in accordance with the "less rigid" *Browning-Ferris* analysis. *Butterbaugh*, 479 F.Supp.2d at 493. Perhaps that is why the Water Authority places significant reliance on the factors identified in *Butterbaugh* as being relevant to the "joint employer" inquiry. Document No. 53, pp. 5-12.

In his brief, Vrabel does not specifically argue that the Water Authority employed twenty or more individuals *aside* from those working pursuant to the contract with RDM (or with Laurel). Document No. 58, pp. 8-10. He has no evidence to establish that the Water Authority is, in fact, an "employer" for purposes of the ADEA independent of its contract with RDM. Thus, in order to establish that RDM's employees count as "employees" of the Water Authority for purposes of the ADEA's employee-numerosity requirement, Vrabel must show that twenty or more of those individuals are "employees" of the Water Authority in accordance with the thirteen-factor *Reid* test. *Walters*, 519 U.S. at 211-212, 117 S.Ct. 660, 666, 136 L.Ed.2d 644, 654. In order to establish his own status as an employee of the Water Authority during the period of his employment with Laurel (and his status as a prospective employee of the Water Authority when he applied for a job with RDM), Vrabel must show that he was jointly employed (or would have been jointly employed) by the Water Authority in accordance with the more generalized *Browning-Ferris* test. *Butterbaugh*, 479 F.Supp.2d at 492-493.

15

These two tests, of course, overlap to a considerable degree. *Id.* at 493-494. For this reason, the Court will conduct these analyses simultaneously.

The Court has before it portions of the agreement that the Water Authority entered into with RDM on February 27, 2003. Document No. 51, pp. 5-7. The relevant language in the agreement provides:

D.    The Manager shall seek to obtain qualified employees who have experience working on the Greater Johnstown Water System. Failure to make reasonable efforts to employ such persons shall be grounds for termination of this agreement pursuant to Article XIII. Tentative employment decisions must be submitted to the GJWA so that the Authority can monitor compliance of this requirement.

E.    The Manager shall provide the services of a resident manager who is satisfactory to the GJWA.

F.    The Manager shall provide to the Authority an organizational chart showing all employees with responsibilities for the Authority operation and update the same when changes are made.

*Id.*, p. 7. The plain language of the agreement suggests that while RDM was required to hire individuals who had worked on the Water Authority's water system (which presumably meant those who had worked on the system pursuant to the prior contract with Laurel), RDM was given independent authority to make its own personnel decisions. Although the Water Authority reserved the right to monitor RDM's personnel decisions for the purpose of ensuring that the people working on its system had the requisite experience, it did not reserve the right to direct the hiring (or dismissal) of a particular employee. The Water Authority apparently had to agree only as to who was chosen as the resident manager.

16

In his deposition, Kerr testified that the Water Authority had to agree as to who was hired as the resident manager, but that all other personnel decisions were made by RDM. Document No. 60-2, pp. 23-24. Kerr's testimony is consistent with that of Cernic, who testified that the agreement did not include a requirement that all Laurel employees working on the water system be retained by RDM. Document No. 54-2, p. 22. He indicated that while the Water Authority had hoped that RDM would retain as many Laurel employees as possible, there was an understanding that some such employees may not be retained because of a need to cut costs. *Id.* After all, the Water Authority sought new bids precisely because it did not want to continue paying the amount of money needed to satisfy the demands of the agreement with Laurel. *Id.*

The parties agree that while the majority of Vrabel's time as a Laurel employee was spent working on the water system, he sometimes performed work pursuant to other contracts to which Laurel was a party. Document Nos. 54 & 59, ¶ 9. In his deposition, Vrabel described Kukura, a Laurel employee, as the "closest thing" that he ever had to a supervisor. Document No. 54-2, p. 5. When Vrabel went on trips to read meters, he used a Laurel vehicle. Document Nos. 54 & 59, ¶ 14. His rate of pay was determined in accordance with a collective bargaining agreement to which the Water Authority was not a party. *Id.*, ¶ 17. Laurel maintained Vrabel's personnel file, issued his paychecks, determined his schedule, provided him with work-related equipment, and conducted training sessions attended by him. *Id.*, ¶¶ 14-22.

The record is devoid of evidence that the Water Authority played a role in RDM's decision not to hire Vrabel, or in Laurel's decision to terminate him. Indeed, Vrabel's own testimony indicates that his attempt to hold the Water Authority responsible for the personnel decisions made by Laurel and

17

RDM is based largely on pure speculation. Vrabel testified as follows:

Q. You were not hired by the Greater Johnstown Water Authority?

A. No, I was hired by Laurel Management Company.

Q. Likewise, when you were employed there, decisions to terminate would have been made by Laurel Management's?

A. Could have been.

Q. The Water Authority had no authority to terminate Laurel Management employees?

A. I think it would. Nothing could be further from the truth.

Q. Why do you think the Water Authority had the right to terminate?

A. Because they met with Laurel and they met often, and they did a lot of decision-making.

Q. Who is they?

A. The Water Authority.

Q. Are you aware that they hired or fired anyone from Laurel Management?

A. Did they have a hand in it? Possibly.

Q. Do you have any factual knowledge or any facts to support any contention that the Water Authority fired anyone from Laurel Management?

A. I do not, but some people may have that information.

Q. Who might have that information?

A. Laurel Management. If there was ever an issue, the Water Authority stepped in. It could have. I'm not saying there was, but it could have been. I could give an example.

Q. But you have no facts to support the contention that the Water Authority fired

18

or had anyone fired from Laurel M anagement? Do you understand my question? Do you have any facts to support any contention that—?

A.    No.

Q.    Do you have any facts to support any contention that the Water Authority fired or had input into anyone's termination at Laurel Management?

A.    No, I don't have those facts.

\*\*\*

Q.    Do you have any facts to support any contention that the decision that you were not hired by RDM, that anyone from the Water Authority had any participation in that?

A.    Yes, I do.

Q.    What facts do you have?

A.    I have videotapes and documentation of the Water Authority minutes and videotapes saying this would not happen.

\*\*\*

Q.    What did they say on the tape?

A.    They were asked by councilmen if people were going to be all right and they indicated they were. They said people, being the Laurel employees, the water employees, would be okay.

Q.    But they did not say on the video that they had a part in the decision not to hire you?

A.    I don't believe so, but I would have to look at the video again. It's been a long time since I looked at it, several months.

\*\*\*

Q.    But no one has told you that anyone from the Water Authority took part in the decision not to hire you?

A.    No.

19

Document No. 54-2, pp. 8, 14-15. In light of this testimony, it is clear that Vrabel cannot establish that he was ever an employee (or a prospective employee) of the Water Authority. The Court acknowledges that his continued employment with Laurel was dependent upon Laurel's contract with the Water Authority, and that Laurel's decision to terminate him was directly triggered by the Water Authority's decision to discontinue its business relationship with Laurel. Nonetheless, the mere fact that Vrabel's termination was incidentally caused by a decision made by the Water Authority did not transform the Water Authority into his employer.

Given the evidence of record, it is clear that Laurel (and, after the commencement of the new agreement, RDM) retained the "authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours[.]" *Butterbaugh*, 479 F.Supp.2d at 494. In his deposition, Vrabel testified that the Water Authority had not given him day-to-day instructions about how to do his job.[6] Document No. 54-2, p. 18. He acknowledged that Laurel (rather than the Water Authority) had maintained his personnel file. *Id.*, p. 10. In addition, he testified that, while working for Laurel, he had sometimes performed duties unrelated to Laurel's contractual obligations to the Water Authority. *Id.* Under these circumstances, it is clear that no reasonable jury could conclude that Vrabel was an "employee" (or a prospective "employee") of the Water Authority.

As noted earlier, the broad remedial purpose of the ADEA counsels in favor of a broad

---

[6]Vrabel testified that he occasionally met with Lou Soulcheck, a Water Authority administrator, to discuss matters relating to leaks or other customer-related problems. Document No. 54-2, p. 7. These informal meetings typically occurred anywhere from monthly to three times per year. *Id.* This testimony does not establish that the Water Authority provided "day-to-day" supervision. *Butterbaugh v. Chertoff*, 479 F.Supp.2d 485, 494 (W.D.Pa. 2007).

construction of the term "employee." *Butterbaugh*, 479 F.Supp.2d at 492-493. In contrast, a broad construction of the term "employer" (within the context of the ADEA's employee-numerosity requirement) would extend the ADEA's application to entities not contemplated by Congress as entities subject to that statute's substantive prohibitions. *Id.* at 492. It is for this reason that the more stringent *Reid* test applies in cases involving the employee-numerosity requirement. *Id.* In this case, Vrabel seeks to satisfy the employee-numerosity requirement by establishing that the employees of RDM (or Laurel) count as "employees" of the Water Authority. The Court has already concluded that, under *Browning-Ferris*, Vrabel cannot establish that such employees are (or were) "employees" of the Water Authority within the meaning of the ADEA. It follows *a fortiori* that he cannot establish that the Water Authority employed twenty or more individuals at any time relevant to this case. Accordingly, the Court must grant the Water Authority's Motion for Summary Judgment.[7] Document No. 52.

## B. RDM's Motion for Summary Judgment

In order for Vrabel to establish a *prima facie* case of age discrimination under the ADEA, he must show that: (1) he was in the class of persons protected under the statute (*i.e.*, he was "at least 40 years of age" under § 631(a)); (2) he was qualified for the position at issue; (3) he suffered an adverse employment action (i.e., RDM "fail[ed] or refuse[d] to hire" him within the meaning of § 623(a)(1)); and (4) the circumstances were such that a reasonable person could draw an inference of age discrimination.[8] *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 694 (W.D.Pa. 2006). For

---

[7]This determination moots the Water Authority's cross-claim against RDM. Document No. 28, pp. 11-12.

[8]The Court states the fourth element broadly enough to encompass different circumstances in which an inference of age discrimination could reasonably be drawn. While some courts state the fourth element as requiring that the plaintiff show that he or she was treated differently than a *similarly situated, sufficiently younger* individual, such a showing is not

21

purposes of summary judgment, RDM concedes that Vrabel has established a *prima facie* case of age

discrimination under the ADEA. Document No. 48, p. 3. Thus, there is no need for the Court to

conduct an inquiry regarding the elements to his *prima facie* case.

In order to prevail at this stage, RDM must articulate a legitimate, nondiscriminatory reason for

not hiring Vrabel. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215. In *Burdine*,

speaking through Justice Powell, the Supreme Court explained the nature of the burden placed on a

defendant such as RDM:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of
> discrimination by producing evidence that the plaintiff was rejected, or someone else
> was preferred, for a legitimate, nondiscriminatory reason. The defendant need not
> persuade the court that it was actually motivated by the proffered reasons. See [*Board
> of Trustees of Keene State College v.*] *Sweeney*, [439 U.S. 24,] 25 (1978). It is sufficient
> if the defendant's evidence raises a genuine issue of fact as to whether it discriminated
> against the plaintiff. To accomplish this, the defendant must clearly set forth, through
> the introduction of admissible evidence, the reasons for the plaintiff's rejection. The
> explanation must be legally sufficient to justify a judgment for the defendant. If the
> defendant carries this burden of production, the presumption raised by the prima facie
> case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing
> this burden of production on the defendant thus serves simultaneously to meet the
> plaintiff's prima facie case by presenting a legitimate reason for the action and to frame
> the factual issue with sufficient clarity so that the plaintiff will have a full and fair
> opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should
> be evaluated by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. at 254-256, 101 S.Ct. 1089, 1094-1095, 67 L.Ed.2d 207, 216-217. The Court's

---

required where there is other evidence which tends to support an allegation that age discrimination has occurred. These factors are relevant for their *evidentiary value* (or lack thereof) in creating an inference that age actually motivated (or did not motivate) the challenged decision. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 438-439 (1996). If the individual compared to the plaintiff is not similarly situated, or if he or she is not sufficiently younger than the plaintiff, the plaintiff can still satisfy the *prima facie* hurdle by presenting other circumstantial evidence that age actually motivated the employer's decision. *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491-492, n. 4 (M.D.Pa. 2005).

analysis proceeds with the *Burdine* standard in mind.

In an affidavit, Kerr states that he relied on the opinions of DiNicola, Kukura, Smith and Felix in making personnel decisions for RDM. Document No. 51, p. 44. RDM apparently received forty applications from former Laurel employees, thirty-five of whom were hired. Document No. 49, ¶¶ 10-11. RDM contends that of the thirty-five former Laurel employees that it decided to hire, twenty-nine were over the age of forty and thirteen were over the age of fifty. Document No. 50, p. 6. This assertion is consistent with the statements made by RDM in its position statement to the EEOC. Document No. 51, p. 41. Under these circumstances, however, the demographics of those hired by RDM are of very little evidentiary value. The terms of RDM's contract with the Water Authority *required* RDM to hire individuals who had experience working on the Greater Johnstown water system. *Id.*, p. 7. The contract also required RDM to submit "[t]entative employment decisions" to the Water Authority so that compliance with this requirement could be monitored. *Id.* In his deposition, Kerr testified that *all* of those originally hired by RDM to perform work pursuant to the contract had been former Laurel employees. Document No. 60-2, p. 24. RDM apparently had no choice other than to hire former Laurel employees, and the demographics of those ultimately hired were necessarily linked with the traits shared by those in the narrow pool of applicants available for hire. Therefore, the fact that RDM hired several older individuals provides little support for RDM's position.

Of the forty former Laurel employees who sought positions with RDM, five were rejected. Besides Vrabel, RDM declined to offer employment to Frank Santichen ("Santichen"), Martin Vrabel, Michael Szewczyk ("Szewczyk") and James Popchak ("Popchak"). Document No. 51, pp. 39-40. Santichen has commenced an action against RDM, which is currently pending before this Court. Civil

Action No. 06-72J. The five individuals who were not offered positions with RDM were apparently all over the age of forty. Document No. 62, pp. 9-10. After RDM's contract with the Water Authority went into effect, RDM hired Matthew Curtis ("Curtis"), Brandi Mostoller ("Mostoller"), Sean McGough ("McGough"), Eugene Sanders ("Sanders") and Joseph Trentini ("Trentini"). Document No. 51, p. 47. Mostoller was hired as an administrative assistant, while the other four were hired as utility workers. *Id.* Curtis and Mostoller began working for RDM on a part-time basis during the spring of 2005. *Id.* Curtis was given a full-time position on October 1, 2005, and Mostoller became a full-time employee on September 1, 2006. *Id.* McGough and Sanders began working for RDM as seasonal, temporary employees during the fall of 2005. *Id.* They were both upgraded to full-time status on September 1, 2006. *Id.* Trentini was hired as a full-time utility worker on April 2, 2007. *Id.* When they commenced their employment with RDM, Curtis was twenty years of age, Mostoller was twenty-five years of age, McGough was nineteen years of age, Sanders was twenty-nine years of age and Trentini was forty-one years of age. *Id.* Vrabel specifically calls the Court's attention to the relative youth of those hired by RDM shortly after the contract with the Water Authority went into effect. Document No. 62, p. 10.

In support of its Motion for Summary Judgment, RDM offers legitimate, nondiscriminatory reasons for its decision not to hire Vrabel. RDM contends that it did not hire Vrabel because of his alleged unwillingness to work overtime, his poor worth ethic, his inability to get along with co-workers, and allegations that he had been "curb reading" meters during his employment with Laurel. Document No. 50, p. 4. "Curb reading" is described by RDM as the act of "estimating a customer's water bill from past bills rather than actually going to the customer's location and reading the meter." *Id.*

24

In a deposition, Smith testified about his conversation with Kerr concerning Vrabel's application

for a position with RDM. He testified as follows:

Q.    So when Mr. Vrabel had his interview, what took place?

A.    I wasn't at that interview.

Q.    But Mr. Kerr asked you your opinion on Mr. Vrabel?

A.    Yes.

Q.    What did you say?

A.    Just all that I had said to Mr. Kerr was that I really didn't have anything good to
      say about Paul Vrabel. I didn't come out with any particulars.

Q.    Because he's irascible?

A.    Yes, he's very confrontational, has trouble getting along with other employees
      and his work ethic isn't where I would—I don't regard it as a high standard.

Q.    Mr. Vrabel has stated in a prior occasion that he missed one day of work in 28
      years. Do you know that to be accurate or inaccurate?

A.    I have no idea.

Q.    Did he show up fairly often?

A.    Well, I really, other than the first number of years that I was at the yard that I
      was with Paul Vrabel, his period in time for the past 28 years I really don't know
      what his work work record was. I have never seen his file.

Q.    Which leads me to ask you why you thought his work ethic was poor?

A.    I only know from personal experience, the experience that I've had with him
      over the years. I've worked with him personally, and I mean as far as citing
      examples, I --

Q.    I want you to cite examples.

A.     Well, I know of incidences when he was in the meter department.

Q.     And he was curb reading?

A.     Correct.

Q.     What did you observe him to do?

A.     Well, I didn't observe him to do that, but it was--

Q.     Somebody told you that?

A.     Correct.

Q.     Who?

A.     This was common knowledge down at the yard probably 20 some years ago. That was the reason he was out of the–he was actually kind of banned from the meter department at that time.

Q.     Did you ever see his file?

A.     I never saw his file.

Q.     All right. So is that the reason why you said his work ethic was poor? I'm paraphrasing there.

A.     You know, as I said before, I did not say these things to Chris Kerr directly. I told him I had nothing good to say about Paul Vrabel and that's as far as it went.

Q.     But we're delving into that. You had nothing good to say about him because you felt his work ethic was poor? I believe that's what you stated.

A.     Well, the work ethic among other things. He's a very confrontational personality. He's hard to get along with. It's hard to keep a simple conversation. I've talked with him many times over the years and I generally get some kind of a smart sarcastic remark coming back at me, so like I said I didn't have anything good to say about him and that was as far as the only information that I gave him.

26

Document No. 60-3, pp. 3-5. In its position statement to the EEOC, RDM stated that the managers (meaning DiNicola, Kukura, Smith and Felix) had advised Kerr that Vrabel had been "a poor performer as a meter reader with Laurel," and that "other employees were reluctant to work with him on repair jobs." Document No. 51, p. 39. RDM also asserted that Vrabel had been "belligerent" during the interview, that he had specifically asked for a position as a foreman, and that he had indicated his unwillingness to accept less pay, vacation days or holidays. *Id.*

Kerr's testimony corroborates the testimony of Smith and RDM's position statement. In his deposition, Kerr stated that Smith, DiNicola, Kukura and Felix had unanimously recommended that Vrabel not be hired. Document No. 54-2, p. 32. He indicated that he had been made aware of allegations that Vrabel had curb read meters. *Id.* Kerr further testified that curb reading was a misdeed that, in most instances, would warrant the dismissal of the offending employee. *Id.*, p. 35. He acknowledged that he had not seen Vrabel's file, and that he had accepted the assessment of Smith, DiNicola, Kukura and Felix that Vrabel had curb read meters while working as a Laurel employee. *Id.* With respect to the interview itself, Kerr testified that Vrabel had expressed an unwillingness to accept a position with RDM that offered him less pay, vacation time or sick time than that available to him as a Laurel employee. *Id.*, p. 31. Vrabel apparently insisted that he be offered a position as a supervisor. *Id.*, p. 33. Kerr described Vrabel's insistence as a "demand" rather than as a "request." *Id.* These factors, along with Vrabel's alleged inability to get along with his co-workers, were described by Kerr as his reasons for not hiring Vrabel. *Id.*, pp. 31-33.

RDM has met its burden of production by offering admissible evidence sufficient for the trier of fact to conclude that Vrabel was not hired because of allegations that he had been curb reading

27

meters, his inability to get along with others, and his "belligerent" tone during his interview with Kerr.

*Reeves*, 530 U.S. at 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105, 117. Thus, the sole remaining issue

is whether RDM actually failed or refused to hire him because of his age, in violation of the ADEA.

29 U.S.C. § 623(a)(1).

Now that RDM has offered a "legitimate, nondiscriminatory reason for [its] action,", the burden

of production shifts to the Plaintiff. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).

> In order to prove the employer's explanation is pretextual, the plaintiff must "cast[]
> sufficient doubt upon each of the legitimate reasons proffered by the defendant so that
> a factfinder could reasonably conclude that each reason was a fabrication . . . or . . .
> allow[] the factfinder to infer that discrimination was more likely than not a motivating
> or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d
> 759, 762 (3d Cir. 1994). A plaintiff who has made out a prima facie case may defeat
> a motion for summary judgment by either "(i) discrediting the employer's proffered
> reasons, either circumstantially or directly, or (ii) adducing evidence, whether
> circumstantial or direct, that discrimination was more likely than not a motivating or
> determinative cause of the adverse employment action. *Id.* at 764.

*Wishkin* at 186 (citing *Fuentes v. Perskie*, 32 F.3d 759, 762, 764 (3d Cir. 1994)).

As noted earlier, RDM concedes that Vrabel has established a *prima facie* case of age

discrimination. In the Court's view, Vrabel's *prima facie* case is relatively strong. Shortly after the

contract between RDM and the Water Authority went into effect, RDM hired four individuals under

the age of thirty. Document No. 51, p. 47. Moreover, the Court does not view RDM's arguments

concerning the demographics of the former Laurel employees initially hired as significant, since it is

clear that the terms of RDM's contract with the Water Authority *required* RDM to hire individuals with

experience working on the Greater Johnstown water system, thereby limiting the applicant pool to those

who had worked for Laurel. *Id.*, p. 7.

In both its position statement to the EEOC and the testimony of its witnesses, RDM has consistently maintained that it did not hire Vrabel because of his belligerent tone at the interview, his inability to get along with co-workers, and his alleged instances of curb reading meters. Vrabel offers no evidence which casts doubt on these proffered reasons.[9] Indeed, these articulated reasons are actually buttressed by Vrabel's own deposition testimony. In his deposition, Vrabel acknowledged that, during the interview, he had indicated to Kerr that he expected to make the same amount of money that he had been making as a Laurel employee. Document No. 54-2, p. 17. He insisted that the Water Authority had expressed its desire that the transition of its contractual relationship from Laurel to RDM would not "hurt" any of the Laurel employees. *Id.* Vrabel also confirmed that he had curb read meters by testifying as follows:

Q. While you were employed by Laurel, were you aware of any discipline lodged against you?

A. Any–?

Q. Discipline, by Laurel.

A. Against me?

---

[9]The Court acknowledges that Kerr told all five of the applicants who were not offered positions with RDM that RDM could not afford to hire them. Document No. 51, p. 39. Nevertheless, this Court has previously recognized that the communications between employers and prospective employees are often lacking in the candor that individuals commonly expect to be present in ordinary circumstances. *Lynch v. Robertson*, 2007 WL 2407276, at *13, 2007 U.S. Dist. LEXIS 60835, at *37-41 (W.D.Pa. August 20, 2007). The fact that Kerr did not accurately relay to Vrabel the true reasons for the personnel decision at issue in this case does not mean that Vrabel has sufficiently cast doubt on RDM's proffered reasons for not hiring him to defeat RMD's Motion for Summary Judgment. An evaluation of the genuineness of any statement must always take into consideration the circumstances under which that statement was made. *Republican Party of Minnesota v. White*, 536 U.S. 765, 780, 122 S.Ct. 2528, 2537, 153 L.Ed.2d 694, 708 (2002)(referring to promises made by candidates for political office as "the least binding form of human commitment"). No reasonable jury could conclude that RDM's proffered reasons for not hiring Vrabel (i.e., the allegations of curb reading, his belligerent tone during the interview, and his inability to get along with co-workers) were *post hoc* fabrications *solely* because Kerr did not accurately relay those reasons to Vrabel during the interview.

29

Q.    Yes.

A.    Twenty-five (25), 26 years ago. They said that I curbed a meter, which means that I said I read a meter that I didn't read.

Q.    Explain that, please.

A.    Meaning that I put a meter reading in where I didn't actually read the meter. We were told to estimate them at the time if we couldn't get in to get it, which is the same thing as curbing. I said, that's what you told me to do. They said no, we didn't.

Q.    What happened in regard to that?

A.    I didn't get any time off or anything like that.

Q.    Was there a written reprimand put in your employment file?

A.    I don't know.

*Id.* It is clear from Vrabel's testimony that he does not deny the core factual bases for RDM's articulated reasons for not hiring him.

Vrabel has failed to provide evidence sufficient to enable a reasonable jury to conclude that the reasons given by RDM for not hiring him were not the true reasons for that particular decision. Thus, Vrabel must produce evidence that demonstrates to a "factfinder...that [age] discrimination was more likely the cause of his discharge." *Fuentes* at 767.

Vrabel has no evidence to support his assertion that RDM discriminated against him because of his age. In fact, his testimony indicates that he believed that Water Authority personnel did not want him working pursuant to the contract with RDM because of his prior union activities, and because they wanted to make room for their own relatives to be hired. Document No. 51, p. 60. An ADEA plaintiff cannot prevail merely by showing that an employer has discriminated on the basis of an age-neutral

30

factor. This is true even where that factor is closely correlated with age. *Hazen Paper Company v. Biggins*, 507 U.S. 604, 608-614, 113 S.Ct. 1701, 1705-1708, 123 L.Ed.2d 338, 345-349 (1993). The ADEA means what is says. It prohibits a failure or refusal to hire because of an applicant's *age*. 29 U.S.C. § 623(a)(1). Since Vrabel has failed to present sufficient evidence to conclude that RDM failed or refused to hire him *because of his age*, the Court must grant RDM's Motion for Summary Judgment. Document No. 48.

## VI. CONCLUSION

The evidence of record is insufficient to enable a reasonable trier of fact to conclude that Vrabel was an employee (or a prospective employee) of the Water Authority. Even if the Water Authority had been Vrabel's employer (or prospective employer), the Water Authority would nevertheless be entitled to summary judgment on the alternative ground that Vrabel has failed to produce evidence that RDM's decision not to hire him constituted a violation of the ADEA. Consequently, the Court must grant the Water Authority's Motion for Summary Judgment. Document No. 52. Since no reasonable jury could conclude, based on the evidence of record, that RDM failed or refused to hire Vrabel because of his age, the Court must grant RDM's Motion for Summary Judgment. Document No. 48. Accordingly, the Court will grant both Motions for Summary Judgment pending in this case.

An appropriate Order follows.

31

**AND NOW**, this 31st day of March, 2007, this matter coming before the Court on RDM-Johnstown LLC's Motion for Summary Judgment (Document No. 48) and the Greater Johnstown Water Authority's Motion for Summary Judgment (Document No. 52), IT IS HEREBY ORDERED that both Motions for Summary Judgment are **GRANTED**.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

32